# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 90 C 0950 | **DATE** | MAY 24, 2001 |
| **CASE TITLE** | ANN ERWIN, et al. v. CITY OF CHICAGO, etc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for **JUNE 13, 2001 at 11:30 a.m.**

(6) ■ Final pretrial order submission set for **JULY 11, 2001 at 11:00 a.m.**

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion to clarify prior collateral estoppel ruling [273-1] is denied. Defendant's motion to apply the collateral estoppel ruling in Erwin [271-1] is granted. Plaintiffs' motion for Rule 11 sanctions and a hearing on the motion [279-1,2] is denied. Defendant's renewed motion for partial summary judgment [270-1] is granted. Joint motion to trifurcate trial [269-1] is denied without prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 6 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed MAY 25 2001 | 282 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | MAY 24, 2001 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| CW | courtroom deputy's initials | FILED FOR DOCKETING 01 MAY 24 PM 5:46 Date/time received in central Clerk's Office | mqm mailing initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT PETIT, et al., )
)
Plaintiffs, )
)
v. )      No. 90 C 4984
)
CITY OF CHICAGO, a municipal )
corporation, )
)
Defendant. )
-----------------------------------)
)
ANN ERWIN, et al., )
)
Plaintiffs, )
)
v. )      No. 90 C 0950
)
CITY OF CHICAGO, a municipal )
corporation, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

DOCKETED

MAY 25 2001

Before the court are two cases involving promotions in
the Chicago Police Department and allegations that White police
officers were discriminated against in the process.  The <u>Petit</u>
case (90 C 4984) involves promotions to sergeant based on a 1985-
1988 sergeant promotional examination that produced an
eligibility list used between December 1988 and September 1991.
The results of the examination were adjusted for race and there

were also out-of-rank-order promotions of Hispanics and women.[1]
See generally Petit v. City of Chicago, 31 F. Supp. 2d 604 (N.D.
Ill. 1998) ("Petit II"). The Erwin case (90 C 950) involves
promotions to lieutenant based on a 1987 examination that
produced an eligibility list used for 1988 and 1990 promotions.
See generally Erwin v. Daley, 92 F.3d 521 (7th Cir. 1996), cert.
denied, 519 U.S. 1116 (1997); Erwin v. City of Chicago, 1998 WL
704295 (N.D. Ill. Sept. 30, 1998).

The Petit and Erwin cases and a number of other police
promotional cases from the same time period were previously
assigned to a single judge for consolidated discovery. After
completion of the consolidated discovery, each individual case
was returned to its assigned judge for further proceedings. It
was subsequently represented that Erwin and Petit have a number
of common issues that could be resolved in a joint trial.
Thereafter, Erwin was reassigned. Before the reassignment of
Erwin, it had been held that collateral estoppel would be applied
in the Petit case based on the judgment entered following a trial
in the Majeske case, which concerned promotions to detective.
See Majeske v. City of Chicago, 29 F. Supp. 2d 872 (N.D. Ill.
1998) ("Majeske I"); Petit v. City of Chicago, 1999 WL 66539

---

[1]For brevity in writing, the racial, national origin, and
gender discrimination in this case will be referred to as
"racial" discrimination. As to the promotional examination at
issue in Petit, the score adjustments based on race will be
referred to as "racial standardization" and the out-of-rank-order
promotions will be referred to as "racial promotions." Racial
standardization and racial promotions will be referred to jointly
as "racial preferences."

(N.D. Ill. Feb. 8, 1999) ("Petit III"), reconsideration denied, 1999 WL 261706 (N.D. Ill. April 15, 1999) ("Petit IV"). Proceedings in Petit and Erwin were subsequently stayed pending resolution of the appeal of the district court ruling in Majeske I.

Following Majeske I's affirmance on appeal, see Majeske v. City of Chicago, 218 F.3d 816 (7th Cir. 2000) ("Majeske II"), cert. denied, 121 S. Ct. 779 (2001), the parties have filed additional motions. Presently pending are (1) defendant's motion to clarify the Petit III and Petit IV collateral estoppel rulings in light of Majeske II; (2) defendant's motion to apply the collateral estoppel ruling in the Erwin case; (3) plaintiffs' motion for Rule 11 sanctions based on alleged factual misrepresentations in the Erwin collateral estoppel motion; (4) defendant's renewed motion for summary judgment as to the claims of certain plaintiffs, which is based on a Supreme Court decision (Texas v. Lesage, 120 S. Ct. 467 (1999)) issued subsequent to the summary judgment ruling in Petit II; (5) plaintiffs' motion for partial summary judgment as to defendant's narrow tailoring defense; and (6) the parties' joint motion to trifurcate the trial.

## I.  COLLATERAL ESTOPPEL MOTIONS

In Petit III, 1999 WL 66539 at *5, the collateral estoppel effect of Majeske was summarized as follows:

> At trial, plaintiffs will be precluded from
> disputing that, during the decades prior to 1989,

(a) African-American patrol officers were subject[ed] to intentional, unfavorable treatment in assignments; (b) African-Americans and Hispanics were subjected to intentional, unfavorable treatment in hiring for patrol officer positions; (c) supervisory police officials acted in ways that were hostile to African-American and Hispanic patrol officers; and (d) the Chicago Police Department tolerated acts of hostility directed toward African-American and Hispanic patrol officers. The Majeske case contains no specific findings as to the extent of these types of discrimination. To the extent genuine disputes exist and it would be relevant, plaintiffs are not precluded from presenting evidence that the extent or frequency of discrimination was less than that claimed by the City. However, during preparation of the final pretrial order, the parties are to act in good faith in attempting to reach stipulations as to the pre-June 1989 discrimination. Additionally, to the extent relevant, plaintiffs are not precluded from presenting evidence to support any contention that the aforementioned conduct did not exist from June 1989 through September 1991.

Referring to this passage from Petit III, Petit IV states:

. . . This, however, is not necessarily the precise manner in which the jury will be informed about the precluded issues. It will be presented to the jury either in the form of a stipulation or a jury instruction and such stipulation or instruction will have to be made consistent with other instructions that the jury will receive. As part of the final pretrial order, the parties are to include the proposed stipulation or instruction. Hopefully, the parties will be able to agree on the language, but, if not, each side will have to submit its own proposal.
* * *
. . . The City's remedial action had to be tailored to the past discrimination that actually occurred. See Petit III, 1999 WL 66539 at *4. Majeske does not make specific findings as to the extent of past discrimination against patrol officers. Therefore, unless the parties reach a stipulation, issues as to the extent of the past discrimination are open issues for trial. Plaintiffs still are precluded from contending

> that the past discrimination was not significant.
> Whether significant trial time will be saved by
> the collateral estoppel ruling will depend on the
> available evidence and any stipulations of the
> parties. <u>Majeske</u> cannot be accorded a greater
> estoppel effect than it supports as an expedient
> for shortening the trial.

<u>Petit IV</u>, 1999 WL 261706 at *1-2.

In light of <u>Majeske II</u>, defendant seeks a ruling that it is not required to present any anecdotal or other evidence to establish discriminatory intent regarding pre-1989 discrimination in the hiring of patrol officers. Defendant also seeks a ruling that it need not present evidence of discrimination in promotion procedures, only evidence that the intentional discrimination in hiring patrol officers had a discriminatory effect on the number of minorities promoted to sergeant and lieutenant in that the pool of applicants for those positions[2] had a reduced number of minorities. Defendant also contends that plaintiffs should be precluded from presenting anecdotal evidence regarding discrimination against patrol officers.

As was held in <u>Petit III</u>, 1999 WL 261706 at *6, the burden is on the party invoking estoppel to show that all the elements of estoppel are satisfied. <u>See also</u> <u>Kulavic v. Chicago & Illinois Midland Ry. Co.</u>, 1 F.3d 507, 517 & n.6 (7th Cir. 1993). This includes "establishing which issues were actually determined in [its] favor in the prior action."

_____

[2]The Chicago Police Department does not hire sergeants and lieutenants from the outside, it only promotes members of the police force to those positions.

_Appley v. West_, 832 F.2d 1021, 1025 (7th Cir. 1987) (quoting
_Gilldorn Savings Association v. Commerce Savings Association_, 804
F.2d 390, 393 (7th Cir. 1986)).  "If a court does not make
specific findings, the party must introduce a record sufficient
to reveal the controlling facts and pinpoint the exact issues
litigated in the prior action.  Necessary inferences from the
judgment, pleadings and evidence will be given preclusive effect.
If there is doubt, however, collateral estoppel will not be
applied.  If the decision could have been rationally grounded
upon an issue other than that which the defendant seeks to
foreclose from consideration, collateral estoppel does not
preclude relitigation of the asserted issue." _PaineWebber,_
_Inc. v. Ras_, 767 F. Supp. 930, 932 (N.D. Ill. 1991).  The failure
to use a special verdict form that would be sufficiently detailed
for collateral estoppel purposes in other proceedings cannot be
remedied by speculation as to what the jury decided.  _See_
_Woodward v. Mutual Benefit Life Insurance Co._, 1997 WL 488277 *2
(N.D. Cal. Aug. 14, 1997).

_Majeske II_ does not significantly alter the basis on
which _Petit III_ and _Petit IV_ was decided.  Defendant does not
attempt to detail the basis of the jury's findings.  Instead, it
cites to _Majeske II_, 218 F.3d at 820-21, which summarizes some of
the testimony at the _Majeske_ trial.  Moreover, in determining
whether the evidence was sufficient to support the district court
judgment, _Majeske II_ viewed the evidence in the light most
favorable to the City and drew all reasonable inferences in the

City's favor. Majeske II, 218 F.3d at 820. In contrast, only inferences necessary to the judgment are to be accorded a collateral estoppel effect. For purposes of applying collateral estoppel, it cannot be assumed that the jury found to be true the particular testimony summarized in Majeske II. It has not been shown that any particular piece of testimony had to be found to be true in order for the jury to have answered yes to the pertinent special verdict questions recited in Petit III, 1999 WL 66539 at *3. In other words, it has not been shown that any of the recited evidence was the only evidence available to support a particular special verdict answer. At the present time, the court cannot be any more specific as to the collateral estoppel effect than was stated in Petit III and Petit IV.

Additionally, defendant's arguments indicate a failure to take into account the appropriate roles of the court and jury. As to the underlying facts that were found by the Majeske jury, both the district court and Seventh Circuit were limited to determining whether the evidence was sufficient to support the jury's findings, that is, the jury's responses to the special verdicts.[3] The evidence being sufficient does not mean that the factual determinations of the jury were the only reasonable determinations. The evidence may have been sufficiently disputed

---

[3]The Majeske jury made a large number of additional findings that are not a basis for collateral estoppel in Petit and Erwin. Those included findings regarding the discriminatory effect on detective hirings. Defendant's present motion seeks clarification regarding possible similar findings concerning sergeants and lieutenants.

such that it would have been reasonable (and thus sufficiently
supported) for the jury to have found either way on many or all
of the special verdict questions. Defendant presently seeks
clarification as to whether any further anecdotal evidence need
be presented. To the extent sufficient information is provided
and it is appropriate to provide such clarification, defendant
would still have to determine for itself whether it is confident
that such evidence is strong enough to actually convince the
jury. In other words, even if the evidence is legally
sufficient, defendant may still desire to present additional
evidence to better ensure it succeeds before the jury. In most
situations, it is inappropriate for the court to advise either
side as to the court's views of the strength of each side's case.

It may be that strong statistical evidence viewed along
with the facts taken as true based on collateral estoppel will be
sufficient to support a jury verdict that supports a finding of a
compelling government interest that would justify race-conscious
remedies for past discrimination. But such a determination
cannot be made prior to hearing the actual statistical evidence
and other relevant evidence that may be presented at trial.[4] The
court is also in no position to rule on the admissibility of
possible evidence by plaintiff that has not been identified other
than to pejoratively refer to it as "anecdotal." As held in the

---

[4]This is not meant as an invitation for defendant to make
a fourth attempt at a collateral estoppel ruling by submitting
another motion with more detailed factual support. The court
would decline to entertain such a motion.

prior rulings, plaintiffs may not dispute the existence of the discriminatory conduct established by collateral estoppel, but they may attempt to dispute the extent of the discrimination, including the extent of its effect.[5] The court declines to clarify the collateral estoppel ruling in the manner requested by defendant. As previously stated, the parties must first seek to agree on a stipulation or jury instruction concerning the estopped facts and, if no agreement can be reached, include each side's version in the final pretrial order. Defendant, with the advice of its counsel, must determine for itself what evidence beyond this stipulation or jury instruction it will need to present to successfully prove its case to a jury.

The parties' briefs do contain a legal disagreement that can be resolved by this court. Seventh Circuit case law supports that discrimination in hiring that results in underrepresentation of minorities at a higher position can constitute a compelling government interest even absent discrimination during the actual promotion process. See McNamara v. City of Chicago, 138 F.3d 1219, 1223-24 (7th Cir.), cert. denied, 525 U.S. 981 (1998). As defendant concedes, it would still have to show a causal connection between discrimination in hiring patrol officers and

_____

[5]To the extent appropriate objections exist as to evidence intended to be presented at trial, either side may file an appropriate motion in limine with the final pretrial order. Such a motion must more clearly identify the nature of the evidence to which the motion pertains.

the alleged underrepresentation of minorities in sergeant
positions.

Another issue concerning the collateral estoppel effect
of _Majeske_ is whether it also applies to the _Erwin_ plaintiffs.
As to the _Petit_ plaintiffs, it was held:

> Although not all the plaintiffs were parties to
> _Majeske_, 19 of the present plaintiffs were
> plaintiffs in _Majeske_, the same attorney
> represents the plaintiffs in both cases, and the
> prior history of consolidated discovery means
> that the available evidence regarding past
> discrimination is the same for both cases.  Under
> these circumstances, it is appropriate to treat
> the plaintiffs in the present case as being in
> privity with the _Majeske_ plaintiffs.  _See
> Petit I_, 766 F. Supp. at 610-13.  _See also
> Monfils v. Taylor_, 165 F.3d 511, 521 (7th Cir.
> 1998); _Tice v. American Airlines, Inc._, 162 F.3d
> 966, 971-73 (7th Cir. 1998).

_Petit III_, 1999 WL 66539 *5.

Like the _Petit_ case, the _Erwin_ case was one of the cases
consolidated for discovery so the available evidence regarding
past discrimination is also the same.  Also like the _Petit_
plaintiffs, the _Erwin_ plaintiffs are represented by the same
attorney.  Unlike the _Petit_ case, of the remaining three _Erwin_
plaintiffs, none were plaintiffs in the _Majeske_ case.  However,
two of the remaining _Erwin_ plaintiffs were called as witnesses by
the _Majeske_ plaintiffs.  The third remaining _Erwin_ plaintiff is
John Jarvis.  On at least two occasions during the _Majeske_ jury
selection, plaintiffs' counsel introduced Jarvis by name.  One
time she identified him as a person who would be assisting her
from time to time during the trial and the other time she did not

identify his role.  On another occasion, in plaintiffs' counsel's
absence, the trial judge referred to Jarvis as a "client
representative," an apparent misnomer, but one that may be
indicative of Jarvis playing an active role in the Majeske trial.
Plaintiffs deny that Jarvis frequently attended the Majeske trial
and provide proof that he was out of the country during some of
the trial.[6]  A copy of Jarvis's passport is provided, as well as
affidavits of Jarvis and plaintiffs' counsel.[7]  Plaintiffs do not
deny that Jarvis attended the Majeske trial on a number of days
nor do they deny, as represented by counsel during jury
selection, that Jarvis assisted counsel.

All three remaining Erwin plaintiffs assisted the Majeske
plaintiffs, either with their testimony or by providing
assistance to counsel.  They also participated in consolidated
discovery proceedings involving the Majeske case and do not
presently contend that they have different evidence or arguments
to present regarding the pertinent past discrimination that was
not already presented at the Majeske trial.  They also did not

---

[6]The initial representation by defendant's counsel that
Jarvis attended the trial on a daily basis is found to be a good
faith failure of recollection.  No sanction need be imposed to
help prevent such mistakes in the future.  Plaintiffs' Rule 11
motion will be denied.

[7]Plaintiffs did not provide this support with their
answer to the motion, which contains only vague denials of
defendant's factual statement.  Instead, plaintiffs waited to
include the support with their reply in support of their motion
for sanctions which was filed well after defendant's reply in
support of their collateral estoppel motion.  This was not a
proper presentation.

object to reassigning the _Erwin_ case so that at least some joint proceedings could be conducted with the _Petit_ case. If collateral estoppel were not equally applied in both cases, a joint trial would not be appropriate. The _Erwin_ and _Majeske_ plaintiffs apparently had identical interests in disproving prior discrimination and there is no contention otherwise. Their interests were adequately represented in the prior lawsuit in which they also participated. In light of prior consolidated proceedings and rulings as to collateral estoppel, it should come as no surprise that a judgment in one of the other cases would be accorded a collateral estoppel effect. It is fair and appropriate to accord the _Majeske_ judgment a collateral estoppel effect as to the _Erwin_ plaintiffs.

## II. DEFENDANT'S SUMMARY JUDGMENT MOTION

Undisputed facts show that, even absent racial preferences, 244 of the _Petit_ plaintiffs either would not have been promoted to sergeant during the 1988-91 time period or would not have been promoted any earlier than they actually received the promotion. See _Petit II_, 31 F. Supp. 2d at 609. In _Petit II_, it was held that these 244 plaintiffs still had standing to pursue nominal damages and damages for emotional injury. 31 F. Supp. 2d at 610-13.[8]

---

[8]Prior to the reassignment of _Erwin_, a contrary conclusion was reached regarding the _Erwin_ plaintiffs whose attempts at promotion were unaffected by the racial standardization of the 1997 lieutenant examination. See _Erwin v. City of Chicago_, 1998 WL 704295 (N.D. Ill. Sept. 30, 1998). The claims of 187 out of 190 _Erwin_ plaintiffs were

Defendant now moves for summary judgment to dismiss the remaining aspects of these plaintiffs' claims on the ground that Texas v. Lesage, 120 S. Ct. 467 (1999), which was decided after Petit II, holds that a plaintiff who would have been denied a benefit even absent discriminatory consideration has no cognizable § 1983 damages claim based on past conduct.[9]

In Lesage, the plaintiff complained that race-conscious criteria were used in determining admission to a Ph.D. program. Lesage sought money damages and injunctive relief. The undisputed facts on summary judgment were that Lesage would not have been admitted to the Ph.D. program even if racial considerations had not been employed. As to Lesage's § 1983 claim, the Supreme Court held:

> . . . even if the government has considered
> an impermissible criterion in making a decision
> adverse to the plaintiff, it can nonetheless
> defeat liability by demonstrating it would have
> made the same decision absent the forbidden
> consideration. . . . Our previous decisions on
> this point have typically involved alleged
> retaliation for protected First Amendment
> activity rather than racial discrimination, but
> that distinction is immaterial. The underlying
> principle is the same: The government can avoid
> liability by proving that it would have made the
> same decision without the impermissible motive.

dismissed on the ground of lack of standing. For the same reasons that the claims of the 244 Petit plaintiffs will be dismissed, the claims of the 187 Erwin plaintiffs would be dismissed on the merits even if they actually do have standing.

[9]Lesage, 120 S. Ct. at 468-69, distinguishes claims for prospective relief. It has already been held, however, that the 244 plaintiffs' claims for injunctive relief are moot. Petit II, 31 F. Supp. 2d at 614.

> Simply put, where a plaintiff challenges a
> discrete governmental decision as being based on
> an impermissible criterion and it is undisputed
> that the government would have made the same
> decision regardless, there is <u>no cognizable
> injury</u> warranting relief under § 1983.

<u>Lesage</u>, 120 S. Ct. at 468 (emphasis added).

One appellate court opinion has noted that <u>Lesage</u> did not expressly consider the possibility of nominal damages nor did it expressly consider whether emotional damages would be distinguishable from backpay or lost income from not being admitted to a Ph.D. program. <u>See</u> <u>Thigpen v. Bibb County, Ga., Sheriff's Department</u>, 223 F.3d 1231, 1242 n.17 (11th Cir. 2000). <u>Thigpen</u>, however, did not decide the question of whether nominal and emotional damages are distinguishable. Some cases subsequent to <u>Lesage</u> have continued to permit nominal or other damages despite the fact that the same decision would have been reached even absent an impermissible criterion. <u>See, e.g.</u>, <u>Estate of Macias v. Ihde</u>, 219 F.3d 1018, 1028 (9th Cir. 2000); <u>Hiller v. County of Suffolk</u>, 199 F.R.D. 101, 104 (E.D.N.Y. 2001). These cases, however, do not consider the impact of <u>Lesage</u>. No post-<u>Lesage</u> Seventh Circuit case has been found which considers whether nominal or emotional damages are appropriate in "same-decision" situations.

One district court case did expressly consider the application of <u>Lesage</u> for a nominal damages claim. It held <u>Lesage</u> precludes such damages when the government entity would have made the same decision regardless of any race-conscious

criterion and that, for the same reason, such a plaintiff lacks standing. See Tracy v. Board of Regents of the University System of Ga., 2000 WL 1123268 *9-10 (S.D. Ga. June 16, 2000), reconsideration denied, 2000 WL 1521555 (S.D. Ga. July 24, 2000), aff'd in part, rev'd in part sub. nom., Wooden v. Board of Regents of University System of Ga., ___ F.3d ___ 2001 WL 396705 (11th Cir. April 19, 2001). On appeal, the Eleventh Circuit reversed the holding as to standing, but left open the question of whether such a plaintiff could succeed on the merits or be entitled to any damages. Wooden, 2001 WL 396705 at *10-17. Applied to damages, Tracy's holding is consistent with Lesage's clear language that showing the same decision would have been reached regardless of improper criterion "avoids" or "defeats" liability and leaves the plaintiff with "no cognizable injury." Lesage, 120 S. Ct. at 468. See also Sheldon Nahmod, Mt. Healthy & Causation-In-Fact: The Court Still Doesn't Get It!, 51 Mercer L. Rev. 603, 608, 618-19 (2000); Christina B. Whitman, As Essay on Texas v. Lesage, 51 Mercer L. Rev. 621, 624, 636 (2000). Although Lesage is arguably inconsistent with prior precedents, particularly Carey v. Piphus, 435 U.S. 247 (1978), see Tracy, 2000 WL 1123268 at *9; Nahmod, 51 Mercer L. Rev. at 617-18; Whitman, 51 Mercer L. Rev. at 632-33, 635,[10] Lesage is the Supreme Court's most recent statement and it plainly states

---

[10]Whitman also offers a possible basis for reconciling Lesage with prior precedents and leaving open the possibility of nominal or other damages. See Whitman, 51 Mercer L. Rev. at 625, 632-36.

that the "same-decision" defense goes to liability, not just specific types of compensatory damages.  Following <u>Lesage</u>, the claims of the 244 plaintiffs will now be dismissed in their entirety.[11]

### III.  PLAINTIFFS' SUMMARY JUDGMENT MOTION

A race-conscious affirmative action plan that is justified by a compelling government interest in rectifying past discriminatory conduct still must be narrowly tailored to achieve this goal.  <u>Chicago Firefighters Local 2 v. City of Chicago</u>, ___ F.3d ___, 2001 WL 476564 *6 (7th Cir. May 3, 2001); <u>Majeske II</u>, 218 F.3d at 820.  "To determine whether an affirmative action plan is narrowly tailored, the test we use is whether the racially preferred measure is 'a plausible lower-bound estimate of a shortfall in minority representation' that is caused by past discrimination."  <u>Id.</u> at 823 (quoting <u>McNamara</u>, 138 F.3d at 1224).  Aside from the numbers, general factors to consider include "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties."

---

[11]No Rule 54(b) judgment will be entered at this time. Judgment as to the 244 <u>Petit</u> plaintiffs will be entered when the claims of the remaining plaintiffs are resolved.

United States v. Paradise, 480 U.S. 149, 171 (1987) (plurality opinion) (cited in Majeske, 218 F.3d at 824).

In the Petit case, plaintiffs move for summary judgment as to narrow tailoring, contending that the undisputed facts show that the racial standardization and Hispanic racial promotions were not narrowly tailored. Primarily, plaintiffs contend that the racial standardization increased the number of African-American males even though, by 1988, they were already overrepresented as sergeants. Plaintiffs also contend that, by 1990, Hispanics were no longer underrepresented as sergeants, but Hispanics continued to be afforded racial preferences until 1991. Plaintiffs also contend that the racial preferences were not narrowly tailored because they were not temporary, the City did not explore race-neutral alternatives, Asians and Native Americans were counted as Whites, and White females were adversely affected even though females were underrepresented as sergeants.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Schneiker v. Fortis Insurance Co., 200 F.3d 1055, 1057 (7th Cir. 2000); Baron v. City of Highland Park, 195 F.3d 333, 337-38 (7th Cir. 1999). The burden of establishing a lack of any genuine issue of material fact rests on the movant. Wollin v. Gondert, 192 F.3d 616, 621-22 (7th Cir. 1999); Essex v. United Parcel Service, Inc., 111 F.3d 1304, 1308 (7th Cir. 1997).

The nonmovant, however, must make a showing sufficient to establish any essential element for which it will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Shank v. William R. Haque, Inc.</u>, 192 F.3d 675, 681 (7th Cir. 1999); <u>Wintz v. Northrop Corp.</u>, 110 F.3d 508, 512 (7th Cir. 1997). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. <u>Celotex</u>, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. <u>See NLFC, Inc. v. Devcom Mid-America, Inc.</u>, 45 F.3d 231, 236 (7th Cir.), <u>cert. denied</u>, 515 U.S. 1104 (1995); <u>Covalt v. Carey Canada, Inc.</u>, 950 F.2d 481, 485 (7th Cir. 1991); <u>Collins v. Associated Pathologists, Ltd.</u>, 844 F.2d 473, 476-77 (7th Cir.), <u>cert. denied</u>, 488 U.S. 852 (1988). As the Seventh Circuit has summarized:

> The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>id.</u> at 325 ("the burden on the moving party may be discharged by 'showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case"). Then, with respect to issues that the non-moving party will bear the burden of proving at trial, the non-moving party

> must come forward with affidavits, depositions,
> answers to interrogatories or admissions and
> designate specific facts which establish that
> there is a genuine issue for trial. Id. at 324.
> The non-moving party cannot rest on the pleadings
> alone, but must designate specific facts in
> affidavits, depositions, answers to
> interrogatories or admissions that establish that
> there is a genuine triable issue. Id. The
> non-moving party "must do more than simply show
> that there is some metaphysical doubt as to the
> material facts." Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp., 475 U.S. 574, 586 (1986).
> "The mere existence of a scintilla of evidence in
> support of the [non-moving party's] position will
> be insufficient; there must be evidence on which
> the jury could reasonably find for the
> [non-moving party]." Anderson v. Liberty Lobby,
> Inc., 477 U.S. 242, 252 (1986).

Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992).

As to narrow tailoring, defendant has the burden of
presenting acceptable proof illustrating that its plan is
narrowly tailored to correct past discrimination. Plaintiffs,
however, have the ultimate burden of proving the plan is
unconstitutional. Majeske, 218 F.3d at 820; Petit III, 1999 WL
66539 at *4. Statistical evidence supporting a plan can include
data that was not gathered or analyzed until after the plan had
been put in place. Engineering Contractors Association of
South Fla. Inc. v. Metropolitan Dade County, 122 F.3d 895, 911
(11th Cir. 1997), cert. denied, 523 U.S. 1004 (1998); Builders
Association of Greater Chicago v. County of Cook, 123 F. Supp. 2d
1087, 1093 (N.D. Ill. 2000).

On average, Whites scored better than African-Americans
and Hispanics on the 1985-88 sergeant promotional examination.

The City adjusted the scores so that Whites, African-Americans, and Hispanics placed in the top 500 in the same proportion as they took the test. The actual adjustments were a few points or less on a 100-point scale and were within the standard measure of error for the test. On a prior summary judgment motion, plaintiffs presented no evidence that a difference of a few points on the examination was a significant predictor of job performance. Between 1988 and 1991, 458 patrol officers were promoted to sergeant. 402 of the promotions were based on the racially standardized test scores and 56 were out-of-rank-order promotions. 82 of the Erwin plaintiffs would have been promoted to sergeant (or promoted earlier) if not for the racial standardization. Among those 82, 42 were also affected by the racial promotions. The factual background regarding the 1985-88 sergeant promotional examination is set forth in greater detail in Petit II, 31 F. Supp. 2d at 608-10.

To show that its affirmative action plan was narrowly tailored, defendant primarily relies on the statistical analysis of its expert, Bernard Siskin, Ph.D., which is contained in a September 1997 report. Siskin did three analyses of the number of minorities and women in the Chicago Police Department for the time period 1987 through 1991. The first analysis compared the percentage of minorities and women at different ranks of the Police Department, the second compared the percentages of adjoining ranks, and the third purports to compare the actual percentages of minorities and women to what would be expected if

there had been no discrimination.  The third analysis is the most pertinent for present purposes.

The Chicago Police Department only promotes from within. To become a sergeant, one must first be a patrol officer.  For purposes of the third analysis, Siskin first had to determine how many minorities and women would have been hired as patrol officers if not for discrimination in hiring.  Siskin assumed that hiring discrimination had been eliminated by 1975.  For 1975 to 1990, he then compared the percentages for actual hires to the percentages of those minorities in the 20-34 age group of Chicago's population.  For this time period, he found that African-Americans among the new hires represented .95 of their proportion of the Chicago population and Hispanics hired represented .696 of their proportion of the Chicago population. Using these ratios and population data for each year, Siskin estimated how many African-Americans and Hispanics would have been hired as patrol officers from 1950 to 1974 if not for discrimination.  Taking into account the percentage of actual patrol officer hires from each past year who actually were sergeants during the 1987-91 time period, Siskin estimated the number of African-American and Hispanic sergeants there would have been during the 1987-91 time period if not for discrimination in hiring and promotion.

According to Siskin's calculations, the actual number of African-American sergeants as compared to the expected number (that is, the estimated number if not for discrimination) were as

follows for each year: 1987—269/338; 1988—294/367; 1989—282/354; 1990—287/365; 1991—282/371. For Hispanics, the yearly figures are as follows: 1987—44/55; 1988—62/66; 1989—61/65; 1990—66/70; 1991—67/74. Thus, according to Siskin's analysis, both before and after the racially preferenced promotions, there were less African-American and Hispanic sergeants than there would have been if there had been no discrimination in hiring or promotions.[12]

Plaintiffs point to contemporary City personnel documents for the racial and gender breakdowns of sergeants in 1988 and 1990 and for external labor market data. A March 1988 document provides a racial and gender breakdown for the "operational strength" of Police Department sergeants as of that date. A July 1990 memorandum provides breakdowns as of June 1990. A March 1987 affirmative action plan of the City contains external labor pool data. The 1987 plan states that this data is based on 1980 census data and that it was compiled in accordance with applicable federal EEO regulations. Neither side attempts to update this data with 1990 census data or other population data. The documents disclose the following data as to percentages of

---

[12]Siskin used the same procedure to estimate there was a substantial shortfall of female sergeants. The ratio of actual to expected female sergeants was: 1987—29/234; 1988—71/256; 1989—72/246; 1990—88/252; 1991—99/255. Siskin did not provide separate breakdowns or analyses for African-American males, African-American females, Hispanic males, and Hispanic females.

patrol officers, sergeants, and the external labor pool by race and gender.

### Percentages

| | March 1988[13] | | June 1990[14] | | 1980 External Labor Pool |
| | Off. | Sgt. | Off. | Sgt. | |
|---|---|---|---|---|---|
| **White:** | | | | | |
| Male | 60.4 | 71.8 | 62.6 | 66.4 | 31.6 |
| Female | 8.3 | 2.2 | 8.2 | 4.3 | 20.5 |
| Total | 68.7 | 74.0 | 70.8 | 70.7 | 52.1 |
| **African-American:** | | | | | |
| Male | 20.2 | 22.0 | 18.8 | 22.4 | 16.3 |
| Female | 4.1 | 0.3 | 4.4 | 1.7 | 17.8 |
| Total | 24.3 | 22.3 | 23.2 | 24.1 | 34.1 |
| **Hispanic:** | | | | | |
| Male | 5.6 | 3.4 | 5.3 | 4.9 | 6.4 |
| Female | 0.9 | 0.0 | 0.8 | 0.3 | 3.4 |
| Total | 6.4 | 3.4 | 6.1 | 5.2 | 9.8 |

Defendant meets its burden of producing evidence that the racial preferences were narrowly tailored. Siskin's analysis provides a plausible and reasonable estimate as to the number of African-American and Hispanic sergeants that there would have been absent discrimination. The racial preferences that were employed did not result in there being more African-American or Hispanic sergeants than the estimated numbers. Therefore, the burden is on plaintiffs to show--with undisputed facts, this

---

[13]Additionally as to the March 1988 data, out of 8628 patrol officers, 42 (0.5%) were separately counted as Asian and Native American. Out of 1176 sergeants, 4 (0.3%) were separately counted as Asian and Native American.

[14]The June 1990 data includes Asians and Native Americans in the White category.

being summary judgment--that the racial preferences were not
narrowly tailored.

Plaintiffs contend that Siskin's analysis is deficient
because it relies on comparisons to the general population
instead of comparisons to the appropriate external labor pool of
qualified workers. Plaintiffs contend that the general
population statistics for the pertinent age group cannot be used
because becoming a patrol officer involves special qualifications
that are not necessarily equal in all racial groups, including
having a high school diploma, not having felony convictions, and
physical qualifications. See Aiken v. City of Memphis, 37 F.3d
1155, 1165-66 & nn.5-6 (6th Cir. 1994); Hiller v. County of
Suffolk, 977 F. Supp. 202, 207 (E.D.N.Y. 1997); Koski v. Gainer,
1995 WL 599052 *14 (N.D. Ill. Oct. 5, 1995). Compare also
Chicago Firefighters, 2001 WL 476564 at *2-3. First, there is no
absolute prohibition on using general population data as a
comparison. See, e.g., McNamara, 138 F.3d at 1223-24.[15] Siskin,
however, did not merely use the general population of 20-34-year-
old minorities. Instead, he compared that population to the
number of minorities actually hired during a nondiscriminatory
period to extrapolate a ratio to be applied to the general

---

[15]Plaintiffs' reliance on Janowiak v. Corporate City of
South Bend, 836 F.2d 1034, 1039-40 (7th Cir. 1987), cert. denied,
489 U.S. 1051 (1989), is misplaced. In that case, the defendant
relied on comparisons between those employed and the general
population as its only evidence of the existence of intentional
discrimination, not as part of the evidence of narrow tailoring.

population figures. Thus, he employed a reasonable means of estimating both the number of qualified applicants and their interest in police employment in a nondiscriminatory environment. Arguably, the educational and other qualifications of minorities during the 1950's and 1960's might have been proportionately different than during the 1975-90 time period from which the ratio was extrapolated, but there is nothing in the record to show the extrapolation was not reasonable. Moreover, the burden is on plaintiffs to show the City's racial preferences were not narrowly tailored. Plaintiffs make no attempt to recompute Siskin's analysis using labor pool data. Instead, plaintiffs simply point to 1980 labor pool data (not data throughout the 1950 to 1974 time period) and make no attempt to recompute Siskin's analysis using labor pool data. To the extent both sides provided insufficient labor pool data, the appropriate result would be the denial of relief to plaintiffs who bear the burden of persuasion, not the grant of summary judgment for plaintiffs. Cf. Koski, 1995 WL 599052 at *14. In any event, Siskin's analysis is not conclusively deficient because of his means of computing the available minority workforce; the methodology he employed produces a reasonable and plausible estimate.

Plaintiffs also complain that Siskin's analysis is deficient because it does not separately consider minority males and females, in particular African-American males. Plaintiffs

contend that the racial preferences primarily benefitted African-American males, a group that plaintiffs contend was already overrepresented in the sergeant ranks. Plaintiffs point to African-American males being 22.0% (1988) and 22.4% (1990) of the sergeants as compared to being 16.3% of the external labor pool (using 1980 data). Even accepting the 1980 data as the appropriate labor pool data for 1988 and 1990, plaintiffs' argument provides an unrealistic analysis of racial and gender discrimination. The parties do not dispute that, prior to 1975, women were almost entirely excluded from employment as sworn officers of the Chicago Police Department. But even after employment with the Department was opened to women on a more equal footing, societal factors separate from discriminatory hiring by the Department have kept down the number of female employees. This is true of both White and minority women. When considering race discrimination in a predominantly male workforce, it is inappropriate to compare the percentage of African-American males in the workforce with the percentage of African-American males in the available labor pool. When examining or remedying race discrimination, instead the overall (male and female) racial composition of the workforce is the key factor. Even plaintiffs' data shows that African-Americans were underrepresented as sergeants as of 1988 and 1990, 22.3% and 24.1% compared to 34.1% of the external labor pool. Additionally, while it is undisputed that there is a history

of Police Department discrimination in employing women,
plaintiffs do not provide evidence showing that the racially
preferenced promotion of African-Americans and Hispanics had an
adverse impact on females in general or White females
particularly.[16]

Plaintiffs also point to data supporting that the
percentage of minority sergeants was approaching or exceeding
parity with the percentage of minority patrol officers. As of
1988, African-Americans were 22.3% of sergeants and 24.3% of
patrol officers and in 1990, 24.1% of sergeants and 23.2% of
patrol officers. For Hispanics, the numbers were 3.4% sergeants
and 6.4% patrol officers in 1988 and 5.2% sergeants and 6.1%
patrol officers in 1990. Plaintiffs also point to City personnel
documents noting that this parity goal had been or was close to
being achieved. Even in positions where all promotions are from
within, parity with lower ranks, however, is not the elimination
of discrimination. Eliminating the effects of discrimination is
the measure. Majeske II, 218 F.3d at 823; McNamara, 138 F.3d
at 1224. Eliminating underrepresentation at higher ranks may not
be narrowly tailored when it can only be achieved by decimating
the representation of minorities at a lower rank, in other words

---

[16]Using the data provided by plaintiffs, from March 1988
to June 1990, representation of White female sergeants increased
from 2.2% to 4.3% and female sergeants of all races increased
from 2.5% to 6.3%. According to data in Siskin's report, female
sergeants increased from 2.4% in 1987 to 8.1% in 1991. Also,
according to Siskin's analysis, the estimated underrepresentation
of female sergeants decreased from 29/234 (-87.6%) in 1987 and
71/256 (-72.3%) in 1988 to 99/255 (-61.2%) in 1991.

by particularly excessive promotions from the lower rank. The
fact that, by the end of the racial preferences in question, the
number of African-American and Hispanic sergeants remained close
in parity with the number of African-American and Hispanic patrol
officers is evidence supporting that the racial preferences were
narrowly tailored, not evidence that the racial preferences
continued longer than needed.[17]

Plaintiffs' remaining contentions are without merit. The
racial preferences at issue were used for a temporary period of
time, 1988 through 1991. Even though other remedial measures had
been employed prior to 1988, the effects of discrimination
remained and the program put in place in 1988 was temporary until
the next sergeants' examination. Plaintiffs do not point to
evidence of an alternative race-neutral procedure that would have
sufficiently remedied the past discrimination. Defendant
initially considered the examination without racial
standardization and determined that it would continue to have a
discriminatory impact. The inclusion of Asians and Native
Americans as Whites in some of the City's statistics has not been
shown to have resulted in distorted data. The 1988 data shows
there were few Asians and Native Americans employed and Siskin's
analysis relies on African-Americans and Hispanics as a
percentage of all employees, not their ratio to White employees.

---

[17]According to data in Siskin's report, as of 1991,
sergeants were 23.2% African-American and 5.5% Hispanic and
patrol officers were 26.5% African-American and 7.8% Hispanic.

Also, racial standardization of the examination scores was computed for African-Americans and Hispanics as compared to all others, not just as compared to those counted as White.

Plaintiffs have not shown beyond dispute that the City's racial preferences were not narrowly tailored. Plaintiffs' motion for summary judgment will be denied.

## IV.   JOINT MOTION TO TRIFURCATE

The court has previously indicated that it would be appropriate to bifurcate the trial of this case into liability and damages phases. The parties now propose a third phase, by dividing the liability phase into two parts. Defendants contend its actions were supported by three compelling interests: (1) the need to avoid Title VII disparate impact violations through racial standardization; (2) remedying the effects of past discrimination; and (3) the need to improve the operational effectiveness of the Police Department. The parties propose trying the first two issues in phase one.[18] If defendant is unsuccessful in phase one, then the third issue would be tried in phase two. The third phase (damages) would only be necessary if defendant does not succeed at phase one or two.

---

[18]Plaintiffs contend the Title VII defense is not a viable defense, but, to the extent it needs to be tried, plaintiffs agree it should be tried in phase one.

The parties estimate that phase one could be supported by, at most, six witnesses[19] and the trial would take one to two weeks. It is estimated that phase two would require ten to twelve City witnesses, with no specific estimate of the trial time or indication of whether plaintiffs would also have additional witnesses.

The court is disinclined to divide up the liability phase. Since defendant does not explain what it means by its operational needs, it is unclear why that issue would be so much lengthier to try than the other liability issues. Also, presumably narrow tailoring would apply to both liability phases and therefore may need to be tried twice if there are two liability phases. Presently, the motion to trifurcate will be denied without prejudice. At the next status hearing on June 13, 2001, the parties shall be prepared to address appropriate steps to prepare for trial, which will primarily consist of preparing the final pretrial order, which is to be submitted on July 11, 2001 at 11:00 a.m.[20] At the June 13 hearing, the parties will be permitted to further address why trifurcation would be appropriate, including explaining the nature of the operational needs defenses and the evidence supporting it.

---

[19]It is unclear if this includes plaintiffs' witnesses as well.

[20]The parties will not be required to present Local Rule Form 16.1.3 on July 11. Submission of that form will only be required after the liability phase if plaintiffs are successful in proving liability.

IT IS THEREFORE ORDERED that:

(1) Defendant's motion to clarify prior collateral estoppel ruling [0-1/273-1] is denied.

(2) Defendant's motion to apply the collateral estoppel ruling in Erwin [271-1] is granted.

(3) Plaintiffs' motion for Rule 11 sanctions and a hearing on the motion [279-1,2] is denied.

(4) Defendant's renewed motion for partial summary judgment [0-1/270-1] is granted. The claims of the 244 Petit plaintiffs whose promotions were not affected by racial standardization are dismissed in their entirety.

(5) Plaintiffs' motion for partial summary judgment on the issue of narrow tailoring [252-1] is denied.

(6) Joint motion to trifurcate trial [0-1/269-1] is denied without prejudice.

(7) Status hearing set for June 13, 2001 at 11:30 a.m. In open court on July 11, 2001 at 11:00 a.m., the parties shall submit an original and one copy of a final pretrial order in full compliance with Local Rule 16.1 and Local Rule Form 16.1.1.

ENTER:

William T. Hart
UNITED STATES DISTRICT JUDGE

DATED: MAY 24, 2001